, 21-51178, Net Choice versus Paxton. We'll hear first from Mr. Bash. Thank you, Your Honor. May it please the Court. These social media platforms control the modern-day public square, but they abusively suppress speech in that square. Texas responded to the platform's speech suppression with the HB 20. The primary question in this case is whether HB 20's hosting rule complies with the First Amendment. It does, Your Honor, for two core reasons. First, the hosting rule regulates only the platform's conduct, not their speech, namely by preventing them from engaging in viewpoint discrimination against their users. Second, even if you think the hosting rule does regulate the platform's speech, the rule is a valid common carriage regulation like many others that have been constitutionally applied to similar businesses for over a century. I'd like to begin with the second point, the common carriage point, if I may, Your Honors, because I think that presents the cleanest way to resolve this appeal. The platforms do not have an editorial discretion right at stake here, but if you believe they do, the Turner case has confirmed that the hosting rule has validly abrogated that right. I would say that Turner is on all sides of what Turner is here. The Turner majority, of course, upheld requirements that went further than HB 20's hosting rule does, and that were in greater tension with the First Amendment. Congress's rule there forced the cable companies to preferentially treat certain speech at the expense of other speech. That goes beyond common carriage. But those rules survived. And I would submit that if those rules survived First Amendment scrutiny, and they do per well. What I'd really like to emphasize about Turner, though, Your Honors, is that the hosting rule is also valid under the Turner dissents approach. The dissent there, of course, was more protective of the cable companies' speech rights, but even the dissent explicitly suggested common carriage rules would survive under the First Amendment. The platform's main response to the common carriage point is to say that they don't operate like common carriers. But they are wrong. The calling card of a common carrier is the holding out of oneself as willing to do business with all comers on the same terms. That is what the platforms do. I think they admit it. They don't apply different terms to different users. And they were a communications enterprise as well, one of the classic kinds of industries that have been subject to common carriage rules in the past. The problem I have with the common carriage rule, and the rationale for public utility regulation, has been not just holding themselves out to the public, but also the idea of natural monopoly. And these platforms are not natural. They are de facto monopolies, and they may act like illegal monopolies, but they are not natural monopolies because there is no shortage of the cloud, as far as we know. I take your point, Your Honor. What I think I would say is the following. Well, would we not be expanding and contorting common carrier law to say that any state can designate some group as a common carrier? Our point is not that the designation is dispositive, Your Honor. What I would say is that the courts have historically recognized a number of factors when determining whether common carriage regulation is appropriate. The primary factor is this holding out of oneself as willing to do business on equal terms. Another factor is whether the entity is in the communications industry or the transportation industry. I think that this monopoly has been recognized as an important factor, but market power certainly has been. It was to Alfred E. Kahn, my economics professor, who became the head of the Council of Economic Advisors under President Carter, and who was very important in deregulating the trucking industry, the railroad industry, and the aircraft industry. It may be important as a policy matter, Your Honor, to certain economists that the regulated industry actually be a monopoly, but I don't think that's been recognized as a requirement for common carriage rules. And where I would direct Your Honor to is the 1800 era is before telegraph companies, before Western Union had a monopoly in the telegraph industry. The states were imposing common carriage regulation on the telephone companies nonetheless. They were competitive for a brief period of time. The same is true of the telephone companies before the Bell Company monopolized that industry as well. So I don't think that there is a monopoly requirement in order to impose common carriage rules. Of course, under the Communications Act as well, telephone companies have been subject to common carriage rules for about a century under federal law. And the Communications Act does not key that regulation to a requirement that the FCC has discretion to stop applying common carriage rules to the telephone companies. It's exercised that discretion. But the statute does not make monopoly requirements. So I think that's an area of considerable uncertainty. We talk about common carriage here. Let me get you back to conduct versus speech. Certainly the argument by your friends on the other side, and I hope they are your friends on the other side, has been that their moderation is speech. Their terms of service indicate that they're not open unlimited to all, but they will moderate content for a variety of reasons. In the viewpoint of the state, they've moderated poorly and discriminatorily. But regardless, they did announce in advance they would do that. Help me with the concept that this is conduct. Obviously you have Pruneyard and other cases that may not be directly applicable to the Internet. Why isn't there a moderation speech? Well, Your Honor, they're using this editorial discretion concept as a stand-in for their speech rights. And they're using that term as a talisman. I don't think that the editorial discretion right gets them home here. You have to define what editorial discretion really means and how it's been interpreted by the Supreme Court and applied. It's only been applied in limited areas. I mean, the editorial discretion right is the same right that the law schools made in FAIR. It's in their briefing at the Supreme Court, and it didn't carry the day. I think that's because there are limits to that doctrine. One of the limits that we've proposed and that is recognized in all the Supreme Court cases that have found an editorial discretion right is that the discretion has to be exercised ex ante before the content appears on the particular media. That's what makes the application of Pruneyard and FAIR, Rumsfeld v. FAIR, so difficult. Yes, you're right about that. I apologize for being impolite and cutting you off. But it does seem to me that applying that to the Internet, it's impossible to do it in your good Latin phrase ex ante. It has to be done after the fact because of the way the Internet works. Correct me if I'm wrong about that. Why would it matter that they cannot do it or at least do not do it if they're editorializing in advance? This is not a newspaper, as you point out. This is not a classroom. This is not a mall. And so the mechanics of it are different. So if you think ex ante really matters, you can run with that some more, but it seems to me that there may be other reasons that are stronger. Well, we do have other reasons why we think the editorial doesn't apply here, Your Honor. A lot of briefs. But on the ex ante point, I'd like to make two more points, if I may. The first is that I don't think it is impossible for them to apply discretion ex ante. It may not be attractive for their business model to do that. But they could say, Twitter could say, for example, that when you tweet something out, we're going to have somebody review it before it goes live. They don't do that right now. There are billions. Is that right? Messages or filings. Is that is that feasible? Maybe not under the current business model, Your Honor. I don't think they have a First Amendment rights to operate with their current business model. They have a First Amendment. I think one could argue that they have been using ex ante criteria and some very hotly disputed things, such as the, dare I say, the election of 2020, but more obviously, COVID. Certain words, terms and phrases in regard to COVID have been censored for a couple of years now. Right. I mean, whether you call that ex ante or ex post, I think it's irrelevant. They've been censored. Well, Your Honor, maybe I could advance our second argument, why the editorial discretion right simply doesn't apply here. And it's for the following reason. I think this question can best be illuminated by asking whether the platforms are more like telegraph and telephone companies with no editorial discretion right on the one hand, or newspapers and television broadcasters who do have an editorial discretion right. The difference between those entities is the following. With telephones, telegraphs and the platforms, speech is traveling in multiple directions. People go to these places to have a conversation with each other. They're interacting with each other. Private individuals are having conversations. With newspapers, with television broadcasters, that's not what's happening. The speech is flowing in just one direction. It's ordinarily professionally produced. It goes through an editor who screens it, decides whether it deserves to appear on that medium, maybe substantively modifies it, edits it, and then it passes through to a consumer. The consumer doesn't talk back. In that context, it makes sense to say, of course, you have an editor standing in the middle deciding what's going to pass from being professionally produced on to the consumer. When you're just talking about individuals having a conversation with each other, which is what happens on the platforms, it happens on the telephones, it doesn't make sense to say an editor can be interposed between people just having a conversation. And the Supreme Court's never recognized an editorial discretion right that goes that far. I would submit, Your Honors, that the telephone companies could operate this way as well. They could screen calls and say, we don't like what this caller is saying. We're going to drop their service. No one's ever thought that they have a constitutional right to behave that way. If I may, Your Honors, I'd like to make one other point on the conduct versus speech distinction here. I think this goes to Pruneyard, which is these entities hold themselves open as willing to do business with all comers. People can come and go as they please, just like with them all in Pruneyard. That's the easy case for editorial discretion, I would submit. With newspapers, television broadcasters, and other entities that have been recognized to have editorial discretion, they're not open to the world at large. If you want to publish something in a newspaper, you, a third party, want to publish something in a newspaper, you've got to submit it. It doesn't just automatically pass through and appear on the newspaper's pages. Somebody's going to review it. And as part of that review process, the newspaper is essentially signing off and saying, this deserves publication in our newspaper. That's not what happens on the platforms. Even if they fail to pull something down after the fact, the platform isn't sending a message to the world, we approve of this content. Nobody would reasonably believe that. With newspapers and television broadcasters, when something passes through to the consumer, the newspaper or television broadcaster is putting their stamp of approval on it. I think that's a very critical distinction. Where does Section 230 figure into your argument? Section 230 fits in the following sense, Your Honor. The Section 230 Congress overruled a case that decided to treat Internet platforms somewhat similar to the social media platforms here as a publisher. Section 230 was passed to say that was wrong. You should not be treating Internet platforms as a publisher and you should not be imposing legal responsibilities on them that are akin to the responsibilities that are imposed on publishers. Instead, what the Section 230 essentially did is said that Internet platforms, as a default, should be treated like telephone companies. They're not liable for what passes through their conduits. They're not liable as a default matter and they're also not liable if they start screening some of that content, namely pornography, maybe some other forms of content. However, if the platforms do take an affirmative hand in the content, if they create or develop it in whole or in part, then they are liable. The platforms have escaped liability under Section 230 by saying, we don't create anything in whole or in part. None of this content that appears on our spaces is created in whole or in part, at least when they're raising their Section 230 defense. As part of raising that defense, they've characterized themselves as a conduit, a neutral forum. I don't know that they have to do that to win under Section 230 in those cases, but they're saying it to make a point that we're not responsible for this content. That's why we deserve Section 230 protection. It just doesn't— The brief makes that point fairly strongly, maybe fairly. I'm not sure we're exactly dealing with apples and apples. It seems to me that the arguments on all the cases may really have a different focus. But it seems to me, regardless of which one of you is using 230 as a sword and which one of you is using it as a shield, one of the arguments or one of the points that 230C1 says that no provider user of these services shall be treated as the publisher of any information provided by another information service provider. I should have taken my glasses off. I think that's what it says, content provider. So regardless of whether content moderation creates speech or not, all that would do is perhaps affect the application of the protections of C1, 230C1. It doesn't really alter the First Amendment definition of what speech is. And it does seem to me that your use of 230 in trying to force any of their speech, if it's going to be speech, it's got to fit the 230 dichotomy. It's either somebody else's speech or it's the platform speech. It seems to me their moderation of other speech could still be their speech, regardless of the applicability of 230. Well, I don't think it would be logically consistent with how they used 230, Your Honor, and the reason is the following. In the editorial discretion context with publishers, for example, the publisher is taking— I'm sorry, Your Honor. The Miami Herald. The Miami Herald, of course. The publisher, the newspaper, is taking ownership of the content and it's incurring legal liability for tortious statements in the content, defamation, for example. The platforms are not exposed to legal liability when they comply with Section 230, and the reason why they're not exposed to legal liability is because they're saying, we're not responsible for this. The Miami Herald could never say that about content it's deciding to publish. Same thing with a television broadcaster. So the interaction between Section 230 and the First Amendment presents a novel question for Your Honors, I think, but logically these things—logically their position just doesn't—isn't reconcilable to say that we don't have any responsibility for this content and we also have a First Amendment right to control this content. If I may, Your Honors, I'd also like to make a point about the level of scrutiny that may apply here. Of course, we believe under Turner that at most intermediate scrutiny is applicable and we survive intermediate scrutiny for the reasons I opened with. However, even if you concluded that strict scrutiny applied, I think the hosting rule necessarily survives as well. There is nothing more narrow that the state of Texas could have done than impose common carriage requirements, this narrow anti-discrimination rule. The Turner dissent essentially recognizes that. The Turner dissent wanted to apply strict scrutiny. It said common carriage rules would survive. In fact, our opponents proposed—the only alternative that they proposed is that we build our own social media platform. I think that proves, Your Honors, that there is no more narrow way to regulate them than the way that Texas has here. There are many more aggressive ways to regulate them, and Texas didn't go that far. Texas merely imposed a narrow anti-discrimination requirement that only prohibits discrimination on the basis of viewpoints. They're not even objecting to the provisions that require party— require them to have an appeal, you know, set of rules when they do ban somebody, right? I think that they are challenging the complaint and appeal process. Well, I know they're challenging the idea that, you know, regulation is oppressive, but I didn't see an argument in their brief about that at least giving due process to people who get affected. Right. The argument is essentially that this is oppressive. I don't think that's a First Amendment argument, Your Honors, but I would also direct Your Honors to, for example, the Fair Credit Reporting Act. The Fair Credit Reporting Act imposes very similar obligations to the complaint and appeal process that HB 20 imposes. No one has ever—that act has been on the books for over 50 years. To my knowledge, no one has ever suggested— If that were a rule of law, I would apply it rigorously. But you have a chance for rebuttal. If I have a chance for another question? Oh, yeah. On that, the D&O part, disclosure and operations, this is a facial challenge, unless I'm mistaken. It does seem to me there are some very burdensome provisions, and the argument is that they need to chill speech as opposed to just monetary. It does seem to me the fair amount of this may be something to hold for a challenge after a facial challenge is resolved, but it does seem to me that your argument that this does not chill speech runs up against the possibility that they would have to change their business model, not curate, whatever that means, as opposed to censor and moderate. They would just have to moderate differently. They have to change their speech differently. So if we were to call what they're doing speech, how does that affect your argument that these disclosure and operations rules don't burden or chill speech? Well, I recognize that I'm over, Your Honor, so I'll try to be brief here. Our top-line argument— I believe we have some extra time if I understood the Chief or Presiding Judge. Certainly. Our first argument, of course, as the D.C. Circuit recognized in the American Hospital Association case is that operational burdens simply don't suffice. But I take Your Honor's question, and I think I would categorize the disclosure and operational requirements into three buckets. The first bucket is that they explain how they manage their platforms. The second is that they promulgate an acceptable use policy explaining what they censor. The third is the—I'm sorry, those were in the first bucket, Your Honor. The second bucket is the biannual transparency report. The third bucket is the complaint and appeal process. The first bucket, those two requirements can be met with boilerplate forms. They just append them to their website. That's it. There's not even an operational burden there. This is the same thing as a nutritional label. The second requirement, the biannual transparency report, I understand that that's where a lot of the operational burden may be imposed. But I think that they've overstated this burden, and the district court did as well. The biannual transparency report can be satisfied with top-line numbers, by and large. How many times did you censor content in this category? Their briefing already establishes that they calculate these numbers as is. It's not imposing an additional burden on them to print those numbers that they already calculate. The complaint and appeal process, as we've explained, Your Honor, isn't even really a burden of speech. At best, it's a burden of—it's a burden of conduct with, at most, some incidental effect on speech. It's just, you know, maintain a customer service department. All right, counsel. We'll get back into a short period of time. Thank you, Your Honors. Okay. Mr. Keller. May it please the Court. House Bill 20 is an assault on First Amendment rights. It infringes private companies' editorial discretion over speech. They arrange, prioritize, curate, publish, and disseminate. And it's a content viewpoint and speaker-based law that targets just the select few largest platforms with 50 million or more monthly users. And in the defendant's brief, at least, the defendant did not even try to argue that House Bill 20 satisfies strict scrutiny. And importantly, the defendant's brief does not even cite the Supreme Court's seminal internet-free speech decision in Reno v. ACLU, which held that there is no basis for qualifying the level of First Amendment scrutiny that applies to the internet. Instead, the state has offered a hosting theory that the Supreme Court has rejected in USAID and in Turner and a common carrier theory with no basis in law or fact. And the only governmental interest that asserts leveling the playing field to enhance the speech of others has been rejected repeatedly by the Supreme Court in Arizona Free Enterprise, Hurley, Tornillo, and Buckley. Can I ask you about Hurley? So Hurley held that a parade organizer could exclude an LGBT float because it interfered with the parade organizer's message. And throughout your brief, Hurley is obviously one of your leading cases. You mentioned it right off the bat. And you have adamantly insisted that you are the parade organizer. So I want to make sure I understand exactly what you're saying under the First Amendment. Twitter tomorrow could decide that it can ban all pro-LGBT speech on Twitter. It has a First Amendment right to do that. Yes. That's extraordinary. Well, when it comes to private entities, government doesn't get to dictate what those entities must disseminate, what they can't disseminate. Now, again, Twitter hasn't done anything like that. But it could. It's new ownership or it's future ownership. It could just decide that we, the modern public square of Twitter, that the Supreme Court has told us, I take it, you don't contest. We can decide that in the modern public square, we will have no pro-LGBT speech, period, full stop, end of story. Well, Judge Oldham, this is not the modern public square. Public forum analysis under the First Amendment pertains only to government property. Well, isn't that what you're leading your clients – not the organization but the ones behind them – have all testified to Congress? Haven't they all acknowledged that? And I think the Supreme Court characterized this as the modern public square. Well, in Packingham, that dicta was talking about government power. And this is the key distinction here. What the defendant's position really is is that government control over the speech process is the norm but the freedom to curate, publish, and disseminate speech is the exception. But that turns the First Amendment on its head. If we were talking about some government forum, Judge Oldham, the analysis could turn out differently. But when we're talking about private entities selecting speech, whether it's the Miami Herald or whether it's a cable operator or a bookstore or a radio show or an art gallery, government doesn't get to dictate what any of those entities do. And we know from Reno v. ACLU that websites are web publishers who have full First Amendment protection. So tomorrow, could Verizon decide – Verizon is obviously a common carrier in its provision of point-to-point communication. Tomorrow, under your theory, could Verizon decide that they are going to overhear every phone call, use computers or software or teams of people to listen to those phone calls? And when they hear speech they don't like, they terminate the phone call, they terminate the user, and they prohibit the user from ever using a Verizon service of any kind ever again. That's what the First Amendment requires because it's a private company? No. And two responses, Judge Oldham. First of all, I'd cite the court to the Tech Freedom Amicus brief that goes through how those telecom services are nothing like publishers such as websites. And, indeed, Judge Southwick, you mentioned the D.C. Circuit's net neutrality opinion. Whatever the vagaries there are about internet service providers or the telecom industry, all three judges on that panel, Judges Srinivasan, Tatel, and Kavanaugh, agreed. Websites like Google and YouTube and Facebook and Twitter are not common carriers because they don't hold themselves out as affording neutral, indiscriminate access without any editorial filtering. And that would be the answer to your hypothetical. But we're now conflating two different questions. So the question for the D.C. Circuit is do the common carrier regulations that the FCC administers apply to these enhanced information service providers? My question is different, which is could Verizon come into a federal court and say we, Verizon, a private company, have a First Amendment right to do this? So I'm not asking about the current common carrier rule. I've read the Tech Freedom Amicus brief several times. I get it. I used to even practice in telecommunications law. I got it. I understand the vagaries of those rules. My question is about the First Amendment to the United States Constitution, and could Verizon say, hey, we are a private company, it is our private infrastructure, and if we want to listen to your phone calls, terminate them, and then prohibit you from ever using our services again, that is our First Amendment right? And here's the line I think to be drawn here. Is the entity curating, publishing, disseminating speech? We know from Sorrell, we know from Bartnicki that when you're talking about that, for instance, a bookstore has First Amendment protection as to what books it's going to disseminate. When you're on that line, and I would submit Reno v. ACLU already answers that question, the websites are publishing and they are fully protected, then the First Amendment applies. And so any type of – It's not a website. Your clients are Internet providers. They are not websites. No, Judge Jones. They are websites. They are also applications that could be accessed on the phone. But they are defined in the law as not – as interactive computer services. Now, how can you be one thing for – but which also distinguishes, in my humble view, between an interactive computer service and the publisher, which the law talks of as an information content provider? So regardless of the statutory definitions, it is very clear, for instance, that when Verizon has cables running into your home and that provides you the ability to get onto the Internet, that would be Internet service provision. But when we're talking about a website, for instance, the New York Times.com or Fox News.com or, yes, Twitter.com, YouTube.com, that those are websites that are publishing information for mass dissemination upon the Internet. And this also goes to why there's a complete mismatch between even calling them common carriers. Their speech in their websites is what is being carried upon those fiber optic lines or otherwise. And so maybe Internet service providers could be common carriers, but websites, just like books, just like newspapers, just like art galleries, just like all sorts of other examples where you have private entities that are public. Are your clients interactive service providers, interactive computer services under 230? They do qualify for Section 230 protection. That's right. So if what you say – I'm sorry. I must be – I'm probably dumb, but I don't understand why entities that accept this definition under as interactive computer service who shall not be treated as a publisher or speaker of any information provided by another information content provider. If we hold that you are publishers or speakers of information that you choose not to provide from an content, then you do not have 230 protection. I don't see how you can have it both ways. So there is no tension between the First Amendment and Section 230 both protecting editorial discretion. And here – I mean no statute can overturn a constitutional right. But had Congress premised this on the representations, I believe, of interactive computer service providers, that they were different from newspapers and therefore were not liable under – potentially under New York Times v. Sullivan. If we say no, Congress was wrong, then the whole basis for this law is – fails. Well, Your Honor, I think online newspapers today also have Section 230 protection. And I would – And I understand that, but I don't see Facebook, YouTube, and Google as being the same as an online Breitbart or Axios or HuffPo or whatever. We're not saying they're identical, but I also think that that's nowhere close to where the First Amendment line would actually be. And if I take my friend's point on Section 230, I think there's actually just a policy disagreement about what Section 230c.1 should be that goes to what protection should websites have. And this, by the way, this goes to all websites, not just the select few with 50 million or more users that fit the social media platform definition of HB 20. But if that's their objection, how Congress worded that statute and the protections of that, of course, that would be a policy decision for Congress. It can't affect the First Amendment rights because otherwise if you could just take the common care – Did Congress overrule New York Times v. Sullivan? No. I would cite City of Bernie v. Flores that Congress – So this law presumes that there is something protected by New York Times v. Sullivan that is not covered by this law? Well, I think there are – I'm not sure if that's right, but there are many instances in which a statute can provide additional protections beyond what the Constitution does. And so if Section 230c1 provides more protection than the First Amendment, okay, but House Bill 20 has nothing to do with that. We're talking about the editorial discretion of what websites don't want to publish and don't want to disseminate. And so in some ways there's a complete mismatch of trying to inject 230 into that debate. And if there's any tension, it's the choice of language that Congress used in 230c1. But they're clearly overrelated. They're using a First Amendment term, publisher, in Section 230. So it's – I'm not sure I understand the argument that they're just – that these are two ships passing in the night, that they have nothing to do with one another. Well, and I think it has to go back to the impetus for why the statute was passed, Section 230. The Stratton-Oakmont decision v. Prodigy held that when websites are exercising editorial control, they are publishers, and then that changes the liability regime. Congress responded in Section 230c1 saying, well, you can't be treated as a publisher going forward even though you are in fact a publisher. I mean this Court's Doe v. Myspace decision has said the reason why a website is protected when it screens, monitors, and deletes content is because that is quintessentially related to the publisher's role. But Congress absolutely can give you a statutory benefit like they did in 230c1 and then say, but this is going to forestall you from exerting a First Amendment freedom. I mean, I would assume you would agree with me on that general proposition. Well, I'm not sure I'd want to know if it's also a speaker-based law. Let's ask this hypothetical because maybe this will get at it. Imagine a 501c3, a charitable organization. It markets itself as a 501c3 for decades. It raises tons and tons and tons of money and provides tons and tons of charitable services. And then one day the director of the 501c3 wakes up and says, gosh, I've really enjoyed the statutory benefit that Congress gave me in the tax code, Title 26. But today I would like to exercise my First Amendment freedoms, and I would like to donate $10 million from my 501c3 charitable trust, and I would like to give it to a political candidate under Citizens United. Now, I assume you would agree with me that that speaker has an absolute First Amendment right to speak but does not also have the concomitant right to fall back on a statutory benefit that's inconsistent with it, right? I think the tax consequences, though, would be very different than actually regulating speech. Exactly, so you would forego the statutory benefit in a future case. So are you willing to forego the 230c1 benefits in a future case? Well, Judge Oldham, to be very clear about this, Congress in 47 U.S.C. 223 said they did not want to treat these entities that have 230 protection as common carriers. Quite the opposite. That's why 230c2 is there. That's why we also have the First Amendment rights here. But you want both, right? You want the First Amendment right here to challenge this statute, and you want to have to eat your cake. You want to have it here and eat it too because you want to keep 230c1, unlike my 501c3 hypothetical. Well, and, Your Honor, our members have had and been part of the debate about should there be any reform of Section 230. Regardless of what would happen with Section 230 and the liability for any speech that was in fact published, private entities have a First Amendment right not to disseminate, not to publish speech. And if I could just also address, too, how these social media platforms operate. I mean these are not – this is not simply hosting speech. This is arranging. This is prioritizing. It's recommending. It's next to branded features on websites. The platform's own speech appears next to – sometimes it's a chronological feed. It can be a relevance feed. All of these are editorial functions that look a lot – Right? If it's ads or it's you may also like or it's recommended, I mean that's just what your clients are doing to earn money. So I don't regard that as anything other than commercial speech, if you will. Your Honor, this is not commercial speech in a for-profit motive, does it? I'm saying some – a lot of what you call moderating is commercial speech. I think. Respectfully, Your Honor, I don't believe it is. Unless you're talking about censorship, which is censorship. Commercial speech would be proposing the terms of a commercial transaction. It wouldn't be how the Miami Herald decides to put this article on page one versus page two. I'm sorry. I don't want to get – I take that point. It's a red herring. But let me ask you from what Judge Southwick said. This is a facial challenge, and it looks to me as if Judge Pittman didn't take that into account because the Supreme Court has been pretty clear that facial challenges, even in First Amendment cases, are not the norm anymore. Here, when there is no sufficient governmental interest, whenever the law would operate, it would be unlawful. I mean you couldn't actually get a closer – Did he make that argument? He didn't rule on that argument. He just blew right by and said it's unconstitutional. Yes, we do. There's a footnote in our brief that cites this court's precedent saying if there's not a sufficient governmental interest under strict scrutiny, the law is facially invalid. I think it was a Veterans of Foreign Wars case. Normally we try to – normally I expect a little explanation about why there's no governmental interest. Well, and here's the answer. What Hurley said is that forbidding acts of discrimination among expressive viewpoints is a decidedly fatal objective when it comes to the First Amendment, and that's exactly what Section 7 does. And I see, Your Honors, I have about five minutes left. If I could turn to Section 2 and the operational and disclosure requirements. Wait. I'll bet you get some extra time if you need it is my surmise. Before you finish that, let me ask you something about the D.C. Circuit opinion again by Judge Kavanaugh and U.S. Telecom. He has a real emphasis about market power, and he says if the ISP – I don't want to say provider again – if the ISPs had market power, his outcome in the case would be different. And in his closing page, anyway, he says an important point that needs to be made crystal clear is Supreme Court First Amendment precedents allow the government to impose net neutrality obligations on Internet service providers that possess market power. Is that just a different category altogether? Is Kavanaugh wrong? It does seem to me these three largest companies that are subject to HB 20 have enormous market power. Fit that in with what Judge Kavanaugh was saying. Absolutely, Judge Sedgwick. Three responses. First, we know from Miami Herald that market power alone can't eviscerate First Amendment rights, and we also know from Pacific Gas. Pacific Gas was a state-sanctioned monopoly, and the court held they had a First Amendment right not to be compelled to publish speech. Second response would be there are no findings of market power in this record, and indeed you shouldn't have to have an antitrust trial to determine whether you have First Amendment rights. Well, we heard earlier what Judge Jones was discussing with your friend on the other side of monopoly. Is it not enough here in this record to say there's at least substantial market power by these three entities? No, Your Honor. The social media platform industry is part of a larger Internet website industry, but even if you just take social media platforms, I mean in the time that this case has gone, I mean TikTok has become a social media platform with a much greater user base than others. This court's leading section 230 case is Doe versus MySpace. MySpace is no longer a leading social media platform. And so you have— Let me get into what to some extent Justice Thomas was talking about in his concurring opinion at night, that you're really talking about what is comparable today. And if you've got a bridge over the river, you're not allowing somebody access that they could wade across. But it's not comparable. Now, looking at the world today, looking at alternatives to Twitter that have been tried in the last year or so that haven't survived or haven't been successful as far as I can tell, don't we take the world as it is today and these three are fairly unique providers for which there are no real rivals? I don't believe so, Judge Southerly. You have Parler, Gab, Gitter, Rumble, True Social, Donald Trump's social media platform. And all of these social media platforms have content moderation policies. And so singling out the few largest providers is exactly what this court in Time Warner Cable said you can't do. And that was talking about cable operators, not even the cable channels that were actually disseminating the speech themselves. You're such a good advocate. I bet you can get back to point three after winding up a good bit on one and two. I'm happy to address point three because I think what Judge Kavanaugh was talking about there was the Turner case. First of all, Reno versus ACLU said that Turner and the broadcast-specific rationale about scarcity has no place when it comes to the internet. So on precedent alone, I don't think Turner can apply. Regardless, that was a kind of— Do you think Kavanaugh was wrong? Because Kavanaugh was getting that from Turner. That's right, and I think what—I don't think Judge Kavanaugh was wrong about that. I think the—but it's not only the fact that there would be monopoly power, because we know that from Turner LO and we know that from Pacific Gas. It was monopoly power compared—or also added to the fact that there was a physical gatekeeping control mechanism. That is, as this court said in Time Warner, physical cables running into every individual house that were granted through public easements. Now, internet websites don't have anything like that. Also, and Hurley I think also limited Turner to say that was a case about one speech medium having the ability to completely destroy another speech medium. There, 40 percent of Americans only had broadcast TV, and broadcast TV would have disappeared without those regulations. We have nothing like that. There are all sorts of avenues to communicate on the internet, and Reno v. ACLU made that point a generation ago. If I could turn to Section 2. Go ahead. Thank you, Your Honors. There are four sets of operational and disclosure requirements. They're all unlawful because they compel speech. They chill editorial discretion. The Zotero standard doesn't even apply, and it doesn't apply because these aren't regulating the terms of a commercial transaction or commercial advertising. But even if the test did apply, these are— Why aren't they just, as he said, like nutritional disclosures or the Consumer Product Safety Commission, their standards of safety for the consumers? Well, first of all, the notice, comment, and appeal process isn't like that at all. I thought you didn't really brief that. Yes, we did, Your Honor. We have challenged all of the sections. Yes, you did, but you didn't really argue it very fulsomely. Your Honor, we absolutely challenge these disclosures. Okay. Well, maybe I read that brief a long time ago. So to be very clear about this, these platforms remove billions of pieces of content in a series of months. This is ROA 259 to 259—259.1, 259.2. If you have to provide notice every time, allow— According to what we learned at the Fifth Circuit Judicial Conference, they're not too good about using Russian—removing Russian bots. There are a lot of challenges that social media platforms face, and we're candid about this. Mistakes can be made, but that doesn't mean that you lose First Amendment rights. And here a notice, complaint, and appeal process for billions of pieces of content is going to flood all sorts of complaints, having to do appeals within 14 days. This is all designed to chill the use of editorial discretion. If I can also turn to the biennial transparency report, it sounds innocuous enough, but remember it's only applying to 50 million or more monthly user platforms. This is a voluminous data collection provision. You have to give a description of each tool, practice, action, or technique used in enforcing the policy. When was the last case where a court overturned a legislature's disclosure regulations? NIFLA from the U.S. Supreme Court. I think the Washington Post v. McManus case. There, a Maryland law that was in reaction to perceived Russian interference with the election of Donald Trump, Maryland passed a law saying you have to have all these other disclosures when it comes to political ads for online platforms. But I mean these kinds of disclosures, like terms of service. Well, Your Honor, if I can bracket the acceptable use policy. We admit, I think that provision is the least onerous. I think the other three are incredibly onerous. Are they onerous because they chill speech or are they onerous just because they're going to be very difficult to comply with and take a lot of person power to pull all that together? And don't you need to show that it actually chills your speech if it is compelled commercial speech? Well, it is both, Your Honor. First of all, it chills the exercise of editorial discretion. If you're going to have billions of notices sent out and you're going to have to process all these appeals within 14 days, you're going to think more than twice about exercising editorial discretion to remove content. The same if you have to give a description of each action. We're talking about billions of actions. And now the government is saying you have to come in and justify that? If we were talking about a newspaper or an art gallery, this wouldn't even be a thought that this could pass First Amendment muster. And let's talk about the public disclosure provision, 120.051. That sounds innocuous enough, but, again, it actually says that you have to disclose content management, data management, and business practices. That's everything a platform does. There's no disclosure obligation. That sounds to me like an as-applied challenge, not a facial challenge. Your Honor, I believe any time that there would be having to disclose your entire business practices. Well, frankly, it's a vague term, but when was the last time we overturned a regulation as vague? Well, but this comes back to is there a sufficient governmental interest? No, it comes back to is this appropriate for a facial challenge? Very rarely do you see regulations of business leave aside your speech arguments, just disclosure regulations subjected to facial challenges. But here not only is this compelling speech. But they have to be unconstitutional in all their applications, don't they? And this even fails the Lower Zoderer test because this is not regulating the terms under which service is provided. I mean imagine if the government came in and said you have to append all of this information to the terms of a commercial transaction. That is so much more than the text that NIFLA helped write. Have you bought a house lately? I have, Your Honor.  How many documents do you require do you have at closing? Those are all required by the federal government. And buying a house has no— What is those? I mean, yeah, how much do they drive the price of houses up for consumers? I just have a very difficult time assessing the argument of the richest companies in the world that they cannot fulfill disclosure requirements. Your Honor, buying a house would not have a First Amendment publication speech dissemination aspect. But there is unrebutted record— And you get back to what Judge Southwick said, which was what—I don't think even Judge Pittman accepted the chilling speech rationale for your regulations, did he? Your Honor, I believe he did. But let's take just the unrebutted record evidence, ROA 215 and ROA 1160. It is going to be impossible to comply with most of these operational disclosure requirements. Now, if I can turn to the acceptable use policy provision. So I think this is the one that is the least onerous. And our position is that our members would be in compliance with this. The problem is that the defendant has not taken that position. And throughout this entire litigation, the defendant has not disavowed enforcement of this. And my friend said that you can comply with this by just having a pretty simple form. Well, YouTube and Twitter and Facebook all have their terms for their community standards online right now. And we still have not heard from the defendant that those comply with this provision. And so our worry is that all of these provisions and chilling the exercise of editorial discretion are going to allow all sorts of government investigations and chilling of what private entities have the constitutional right to do. I would submit that the argument the government is pressing today is aggressive. It's sweeping. Today we're talking about the Texas legislature. But the same theory could be exported to talk about the federal government, the federal agency, the state of California, the state of Massachusetts. That's not a road that this court or this country should go down. Thank you. Mr. Dash. Thank you, Your Honor. Three points very briefly. My opponent's Section 230 argument, if I understand it, is the following. Congress recognized that we are publishers and it nevertheless told courts not to treat us like publishers. I don't think that can be right, Your Honors. As we've explained in our brief, Congress was responding to a court case that erroneously treated them like publishers. And Congress's reaction was no, that's wrong, they're not publishers. If, by contrast, you accept my opponent's argument that Congress decided they are publishers but shouldn't be treated like publishers, Section 230 might not be constitutional because in that case it's giving Internet platforms a benefit. The newspapers don't have, the television broadcasters don't have, the note publisher has. It's singled out this one type of entity for a speech benefit that these other parties don't have. The other parties have to answer for defamatory conduct that passes through their spaces. And I would submit that Section 230 recognizes that the platforms do not have to face liability for that content because they are not publishers. It seems to me that it's one thing to talk about libel laws. If their speech is in the form of restricting other speech, I'm not quite sure there's much risk of the kinds of litigation that you're saying 230 was meant to stop. That's right, Your Honor. So publishers usually aren't held liable under defamation laws, for example, for not publishing something. But what Section 230 is getting at there is that the court case that Section 230 purported to overrule was a court case that said, yeah, they may not be publishers ordinarily, but when they start filtering content, then they become like a publisher. And Congress in Section 230c2 said no, that's not right either. They don't become publishers just because they filter some content, pornography and the like. They only become like publishers if Section 230f3, they take responsibility in whole or in part for the creation or development of the content. Isn't 230 really irrelevant to this case? It seems to me what you're talking about is the court. Are they exercising First Amendment rights when they are moderating content? 230 is irrelevant to that. Whatever Congress thinks that you just said wouldn't matter. So do we have any response to why 230 really fits into this argument about whether what they're doing is speech or not? It's the way they use Section 230, Your Honor. They use Section 230 by saying we're not responsible in whole or in part for the creation or development of this content. And when they say that, I think they're relinquishing a First Amendment right to that content. It doesn't make sense to say we're not responsible for this content at all, we had no role in creating it or developing it, but we've got a First Amendment right to control it. There's no case that stands for that principle. If I may, Your Honors, I'd also like to briefly touch on then-Judge Kavanaugh and Turner. One point about Turner, I think my opponent has said in his briefing, and he said up here, that Turner relied on a spectrum scarcity rationale to regulate the cable companies. The Turner case explicitly disavowed that it was using a spectrum scarcity rationale to regulate the cable companies. Spectrum scarcity historically was used as a justification to impose more onerous obligations on broadcasters. But the Turner court said it was not applying that lower level of scrutiny to the cable companies. It was applying the ordinary level of scrutiny that you'd ordinarily expect under the First Amendment. It's true in the U.S. Telecom, in his dissent from denial of en banc, that then-Judge Kavanaugh said that market power was a prerequisite to imposing common carriage regulations. On the one hand, I think that maybe that's true under the Communications Act, and maybe that's all he's talking about. On the other hand, he may also be talking about the First Amendment more generally, in which case his dissent could be applied to our case as well. He relies on the Turner case for this requirement of market power, but nothing in the Turner case says that market power was dispositive. The cable companies did have market power. That was something Congress was responding to. But I don't think that the Turner case is resting on that rationale. Can you talk about a bottleneck that these cables coming into the house or a bottleneck for the transmission or something? You remember the case better than I can, I'm sure. That's right, Your Honor. Isn't that what he's talking about? Isn't that where that idea comes from? That's what supported the regulation in Turner, is you had this market dynamic, maybe a market failure, so to speak, that justified the regulations that were imposed in Turner. But the Turner case didn't say that's the only justification. Of course, even if it was, the platforms do have market power. We're happy to show that on remand. The platforms also benefit from network effects, as Justice Thomas recognized in his recent opinion. That's another justification we would submit that supports these rules. I recognize that I'm out of time, Your Honor. Of course, I'd be happy to answer your questions. I thought you had a third point. I do have a third point, Your Honor, and it's the operational burden from the disclosure requirements. We have a fourth and fifth point too. Let's stop at three. Just three, Your Honor. I'm sorry. Yeah, what's your third point? Only the attorney general can sue to enforce the disclosure requirements. So this operational burden that might be attendant if individual Texans were enforcing them, I don't think really applies here. That's the whole third point, Your Honor. I would ask that you reverse the district court. Okay. Thank you. We are in recess until 9 o'clock tomorrow morning.